AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
1/4/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
01/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KL _____ DEPUTY

United States of America

v.

ERIC T. STORY,

        Defendant.

Case No. 2:24-mj-00041

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 26, 2023, in the county of Los Angeles in the Central District of California, the

defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1), (b)(1)(A)(viii) | Possession with intent to distribute methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Robert McElroy
*Complainant's signature*

Robert McElroy, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  January 4, 2024

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Haoxiaohan Cai, x0762

## **AFFIDAVIT**

I, Robert C. McElroy, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against ERIC T. STORY ("STORY") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine.

2.   This affidavit is also made in support of an application for a warrant to search the following two digital devices (collectively, the "SUBJECT DEVICES"), currently in the custody of the Federal Bureau of Investigation, in Lancaster, as described more fully in Attachment A-1:

    a.   A Motorola cellular telephone with unknown model and serial number, a cracked screen, and a blue back plate ("SUBJECT DEVICE 1"); and

    b.   A blue Apple iPhone with unknown model and serial number that was on STORY's person during his arrest on November 26, 2023 ("SUBJECT DEVICE 2").

3.   This affidavit is also made in support of an application for a warrant for the seizure of samples of deoxyribonucleic acid ("DNA"), which are to be obtained via cotton/buccal, or cheek, swab from the person of STORY, as described in Attachment A-2, which is incorporated herein by reference.  As discussed below, there is probable cause to believe that the DNA sought in this warrant will match DNA on firearms and other evidence in this case.

1

a.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), 846 (conspiracy and attempt to distribute controlled substances), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachments B-1 and B-2.  Attachments A-1, A-2, B-1, and B-2 are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since October 2019.  I am currently assigned to the Los Angeles Field Division Lancaster Resident Agency, which is responsible for investigating violent crimes, white collar crimes, and crimes against children in the cities that fall within the Lancaster Resident Agency area of responsibility.

6.    Since becoming an FBI Special Agent, I have received formal training at the FBI Training Academy in Quantico, Virginia.  This training included segments on conducting criminal investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to extortion, criminal threats, fugitives, homicide, Hobbs Act robberies, murder-for-hire, and other violent crimes. I have participated in many aspects of criminal investigations, such as, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    During the early morning of November 26, 2023, a victim called 911 after an individual, later identified as STORY, pointed a gun at the victim and told the victim he was in the wrong neighborhood and "I'll cap you."  The victim provided detailed information to law enforcement, including that he had been followed in his car by two cars, and that the man who threatened him with the gun was driving a White Chevy Tahoe with license plate 6GPC657.  The caller also identified the second vehicle as a Honda with license plate 8DOX315.

8.    A lone deputy in a marked patrol vehicle located two cars matching the license plate numbers provided by the 911 caller approximately 15 minutes after the 911 call and ordered

3

the drivers to come out.  At the time, the vehicles were parked outside of what was later identified as STORY's residence, on Acorde Street.  Eric STORY got out of the driver's seat of the white Chevy Tahoe, which was registered to him, and John G. BRICENO got out of the Honda.  Both STORY and BRICENO ignored the deputy's command to not move and remain in their cars, and they instead entered a residence on Acorde Street.  After STORY and BRICENO failed to exit after sustained call-outs by deputies, officers initiated barricaded suspect protocols and established a command post outside the premises.

9.    After obtaining warrants to search the vehicle and the residence, deputies executed the warrants and found mail addressed to STORY at the address of the residence, and inside, six firearms not registered to STORY, including four rifles, one with a suspected suppressor/silencer affixed to its muzzle, one pistol revolver, and one pistol ghost gun, various ammunition, and significant amounts of spent ammunition casings found in various rooms.

10.   Separately, in plain view on the passenger seat of STORY's white Chevy Tahoe, deputies saw a gun, later identified as a loaded Smith & Wesson .40 caliber semi-automatic firearm, bearing serial number PDX1004.  STORY also possessed inside his white Chevy Tahoe a box of 9mm ammunition, a plastic bag containing .40 caliber and 9mm ammunition, plus a backpack containing a crystalline solid substance, which later DEA laboratory testing confirmed was methamphetamine with a net weight of approximately 155 grams, and had a 91% purity rating,

resulting in approximately 141 grams of pure (actual) methamphetamine.  Officers seized two cellphones belonging to STORY, specifically, SUBJECT DEVICE 1 from the center console of the Chevy Tahoe used in the assault, and SUBJECT DEVICE 2, which was in STORY's possession at the time of his arrest.

11.  Despite a court-ordered state search warrant permitting officers to take a buccal (oral) DNA swab, STORY resisted efforts to give a DNA sample during the booking process after his arrest on November 26, 2023.  Thus, I am also seeking a federal warrant to use reasonable force to obtain oral DNA from STORY.

<u>**STATEMENT OF PROBABLE CAUSE**</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Deputies Respond to a Dispatch Call for an Assault with a Firearm**

13.  On November 26, 2023, at approximately 3:15 a.m., LASD Deputies responded to 20th Street East and Palmdale Boulevard in the City of Palmdale, CA regarding an assault with a firearm. After the victim, J.T. ("VICTIM"), notified 911 dispatch and requested officers to the scene, deputies arrived and made contact with the VICTIM.  The VICTIM conveyed the following to law enforcement:

14.  At approximately 3:10 a.m., the VICTIM was sitting inside his vehicle with his co-worker near the residential intersection of Rosewood Avenue and Acorde Avenue in the City of

5

Palmdale, when he observed a silver Honda Accord (defined above as the Honda) pull up behind him.  The VICTIM drove away and the Honda began to follow him.  The VICTIM drove to his co-workers' residence on Acorde Avenue and dropped her off.  As the VICTIM began to leave the neighborhood, the Honda continued to follow him and another vehicle, a Chevrolet Tahoe[1] ("the Tahoe"), began to follow him as well.  The VICTIM attempted to make several U-turns in an attempt to avoid both vehicles, however they continued to follow him.

15.  The VICTIM called 911 at approximately 3:15 a.m. and provided both license plates to the 911 dispatcher –– 6GPC657 for the Tahoe and 8DOX315 for the Honda.  The VICTIM drove next to the Tahoe and asked the driver of the vehicle why he was following him.  The driver of the Tahoe told the VICTIM he was in the wrong neighborhood.  A verbal argument occurred and the driver of the Tahoe pointed a firearm, which the VICTIM described as black gun, at the VICTIM.  The driver of the Tahoe then told the VICTIM, "I'll cap you!".

16.  The VICTIM recounted that the driver of the Tahoe was wearing a hat and a dark/black top.  Both vehicles ultimately stopped following him.

17.  Approximately 15 minutes after the VICTIM's 911 call, responding LASD Deputy Brandon Cervantes ("Deputy Cervantes"), saw a Honda Accord bearing California license plate number 8DOX315 and a Chevrolet Tahoe bearing California license plate

---

[1] Deputies later learned through departmental resources that the white Tahoe was registered to Eric STORY.

number 6GPC657 -- the same vehicles matching the license plates
provided in the 911 dispatch -- driving in tandem in a
neighborhood near East Avenue R-11 and 36th Street East in the
City of Palmdale, California.  This location was approximately
half a mile from where the VICTIM reported encountering both
cars.

18.  From there, both vehicles drove approximately a half
mile to 3545 Acorde Avenue in the City of Palmdale, which
officers later identified as STORY's residence.  The Honda
pulled into the driveway and the Tahoe pulled next to the curb
in front of the residence.  Deputy Cervantes was the only
officer on the scene and attempted to detain any occupants of
the two cars at gunpoint.

19.  Deputy Cervantes observed an individual wearing a dark
flannel shirt and a black hat -- later identified as STORY --
exit the Tahoe.  This matched the description that the VICTIM
gave of the driver of the Tahoe, who had pulled a gun on the
victim.

20.  Deputy Cervantes observed a second individual, in a
blue and yellow plaid long-sleeve shirt and no hat -- later
identified as BRICENO -- exit the Honda.  Both subjects ignored
Deputy Cervantes's commands, including a command to stay in
their cars and not to move, and instead, they each walked into
the residence.  Deputy Cervantes was wearing a body worn camera
device, which was activated during the attempted detention.

21.  As additional Deputies responded, Deputies cleared
both vehicles visually for safety from the outside of each

7

vehicle.  Deputies saw a silver/black semi-automatic firearm on the front passenger seat of the Tahoe in plain view.

22.  Call outs were conducted at 3545 Acorde Avenue between approximately 3:42 a.m. and 4:42 a.m.  During this time, officers used amplifying devices to order any occupants of the residence to come out.  The occupants yelled to the officers and refused to come out.  Officers deployed barricaded suspect procedures, and established a command post nearby the residence.

23.  After approximately an hour, at approximately 4:42 a.m., BRICENO and STORY finally came out of the house. By this time, both STORY and BRICENO had changed out of what they had been wearing when they were apprehended by Deputy Cervantes.[2]

24.  A third person, SHENOAH JOHNSON ("JOHNSON"), also got out of the house with STORY and BRICENO.  JOHNSON told the deputies that she was visiting STORY and was a relative.  She further told the deputies that STORY had lived at the residence for approximately three years and she had seen STORY with at least two different firearms during her visit.

---

[2] As discussed earlier, the VICTIM previously told 911 and officers that the driver of the Tahoe had pointed a gun at him, and that the driver had been wearing a black hat and a dark top, possibly a hoodie.  The VICTIM's description matched STORY, who Deputy Cervantes observed exiting STORY's Tahoe wearing a black hat and a dark flannel shirt.  Several hours later, after both STORY and BRICENO changed what they were wearing, the VICTIM was asked to make an identification after being shown both STORY and BRICENO.  The VICTIM identified BRICENO as the person in the Tahoe.  Notably, STORY had changed out of his dark shirt, into a light colored T-shirt, whereas BRICENO had changed into a dark shirt.

25.   STORY and BRICENO were placed under arrest at approximately 5:00 a.m. and 5:29 a.m. and thereafter transported to Palmdale Police Station and booked.

26.  LASD Detective Kenneth Borbon authored a search warrant for the residence and the two vehicles.  At 10:59 a.m. on November 26, 2023, a California Superior Court Judge, the Honorable Christopher Estes, signed the warrants, and the searches were conducted the same day.  LASD maintained a presence outside the residence and near the vehicles from the attempted detention of the suspects through the execution of the search warrants.

**B.   Officers Find Six Guns in Story's Residence, Including A Ghost gun, Ammunition, and Spent Shell Casings**

27.   In the master bedroom of the residence, Deputies found numerous pieces of mail addressed to STORY at the Acorde address, a Tauras Armas model 905 9mm caliber revolver pistol with serial number MU12940 loaded with 5 rounds of ammunition, a Stevens Arms .22 caliber single-shot rifle with serial number D78, as well as 9mm, .22 caliber, and .38 caliber ammunition, and miscellaneous firearm parts.

28.   In an additional bedroom located on the north side of the residence, Deputies found a Remington model 512 .22 caliber rifle with no serial number, a Remington model 522 .22 caliber rifle with serial number 3202497, a .22 caliber Polymer 80 (ghost gun) pistol with no serial number, and plastic bags of ammunition in the bedroom closet consisting of three boxes of

shotgun shells, .22 caliber rounds, 9mm rounds, and a box of 10 .45 caliber rounds.

29.   In the living room, deputies found miscellaneous bulk ammunition along with hundreds of numerous spent casings.

30.   Deputies also found a Ruger .22 caliber rifle with serial number 91067098 in a black rifle case with miscellaneous ammunition in a room adjacent to the laundry room on the south side of the residence.   The rifle in the black case appeared to have a silencer/sound suppressor device mounted on the muzzle.

31.   A photograph of the seven firearms, related magazines, and some ammunition obtained from STORY's residence and the Tahoe, taken by LASD personnel at the police station, is included below:



//

C.   **Officers Find Loaded Firearm in STORY's Car, And Approximately 141 grams of Pure Methamphetamine**

32.   In the Tahoe, which was registered to STORY, and was the same vehicle that STORY was seen exiting by Deputy Cervantes on body worn camera, deputies recovered the following from the front passenger seat:  one Smith and Wesson .40 caliber semi-automatic firearm with serial number PDX1004 and a blue backpack containing a plastic bag of a crystalline substance resembling methamphetamine and a glass bulbous pipe with a burnt end.

33.   In December 2023, the DEA Southwest Laboratory examined the crystallized substance that was found in STORY's Tahoe.  The examination concluded that the substance was methamphetamine, had a net weight of approximately 155.3 grams, at a 91% purity level.  Thus, the substance contained approximately 141.3 grams of actual, pure methamphetamine.

D.   **Identification of the SUBJECT DEVICES**

34.   Based on my review of LASD reports, and my conversations with LASD officers, SUBJECT DEVICE 1 was found during an inventory search of STORY's Tahoe.  STORY's Tahoe was towed and impounded as evidence due to it being used in the commission of a crime.  On December 4, 2023, LASD Detective Kenneth Borbon met with Forensic Identification Specialist (FIS) Ryan Parker with the Los Angeles County Sheriff Scientific Services Bureau at "Sierra Towing" located at 45813 Division Street, Lancaster, CA 93535 to process the Tahoe for photographs, DNA, and any other evidence related to the incident.

35.   After FIS Parker took photographs and collected DNA from the Tahoe, he recovered the following items from the center console of the vehicle:

  a.   One box of 9mm ammunition;

  b.   Plastic bag containing bulk .40 caliber and 9mm ammunition;

  c.   One "aim sports" scope;

  d.   a Blue "Motorola" Cellular phone with cracked screen (the SUBJECT DEVICE 1); and

  e.   A container with unknown yellowish substance inside.

36.   I later obtained SUBJECT DEVICE 1 and placed it in the custody of the FBI.

37.   As captured by officer's bodyworn video, SUBJECT DEVICE 2 was in STORY's hand during the period leading up to his arrest.  SUBJECT DEVICE 2 was booked as STORY's personal property with the Los Angeles County Sheriff's Department –– Palmdale Station, in connection booking number 6706239.  On December 18, 2023, I collected SUBJECT DEVICE 2 from LASD custody, specifically, the LASD's Inmate Reception Center, and placed it in the custody of the FBI.

  **E.   STORY'S CRIMINAL HISTORY**

38.   On December 1, 2023, I reviewed a criminal history report for STORY and learned that STORY has previously been convicted of, or arrested for, the following felony crimes:

  a.   On May 26, 1996, STORY was arrested by LASD for possession of a controlled substance in violation of California

12

Penal Code 11350(A) HS and 11377(A) HS.  STORY was convicted of
the felony offense on November 14, 1996.  In 2022, the felony
was dismissed per California Penal Code 1203.4 PC.

     b.  On February 17, 1998, STORY was arrested by LASD
for statutory rape in violation of California Penal Code
261.5(a).  On April 6, 1998, STORY was convicted of statutory
rape in violation of California Penal Code 261.5(d), a felony
under California Penal Code for a perpetrator who is over the
age of 21 while the victim was under the age of 16.  In 2022,
the felony was dismissed per California Penal Code 1203.4 PC.

     39.  On March 5, 1998, STORY was arrested by LASD for
possession of a controlled substance in violation of California
Penal Code 11377(a).  STORY was convicted of the felony count on
April 6, 1998.  In 2022, the felony was dismissed per California
Penal Code 1203.4 PC.

     40.  On June 22, 2022, as reflected in an LASD report,
STORY was arrested after officers found a backpack in STORY's
car containing a number of illegal narcotics, including
methamphetamine, and a red digital scale with white residue, and
elsewhere in the car, a loaded semi-automatic pistol.  STORY was
charged with possession of a controlled substance while carrying
a loaded firearm in violation of California Penal Code HS
11370.1(c), possession of a firearm by a felon in violation of
California Penal Code 29800(a)(1), unlawful possession of
ammunition by a felon in violation of California Penal Code
30305(a)(1), and possession for sale of a controlled substance
in violation of California Penal Code HS 11378.  STORY has pled

not guilty to the charges and his jury trial was continued to January 2, 2024 under Los Angeles Superior Court case number MA083402.  He is currently out on bond for the state case.

**F.    STORY Refused to Provide DNA Sample**

41.  Prior to executing the warrants, LASD Detective Kenneth Borbon had obtained a California State search warrant signed by the Honorable Judge Christopher Estes on November 26, 2023, to obtain an oral (buccal) reference DNA sample from both STORY and BRICENO.  BRICENO complied and STORY refused to allow the Deputies to obtain a DNA sample.

42.  As part of the investigation, LASD seized various pieces of evidence from STORY's residence and the Tahoe, for which a DNA sample from defendant would be needed to confirm (or disprove) any match.

**G. Request for Use of Reasonable Force**

43.  Based on my training and experience, his prior refusal to submit to the LASD conducted DNA swab, and the nature of the criminal conduct described above, I believe STORY may refuse to comply with any court-authorized efforts to obtain his DNA.  Accordingly, I also respectfully request authority to use reasonable force in order to obtain DNA samples from STORY.

### IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

44.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

14

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of

15

meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.     Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### V.   <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

45.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.     Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.     Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

46.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

47.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

17

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

18

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

48.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19

## VIII.   CONCLUSION

49.   For all of the reasons described above, there is probable cause to believe that STORY has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine.

50.   There is also probable cause that the items to be seized described in Attachment B-1 will be found in a search of the SUBJECT DEVICES described in Attachment A-1, and that evidence of the SUBJECT OFFENSES will be found by taking cotton/buccal DNA swabs, as described in Attachment B-2, from the person of ERIC STORY described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _4th_ day of
January, 2024.

HON. ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE